NETSCAPE COMMUNICATIONS CORPORATION, Plaintiff/Counterclaim Defendant–Appellee,

and

Microsoft Corporation, Plaintiff/Counterclaim Defendant–Appellee,

and

America Online, Inc., Counterclaim Defendant–Appellee,

v.

Allan M. KONRAD, Defendant/Counterclaimant–Appellant.

No. 01–1455.

United States Court of Appeals, Federal Circuit.

July 9, 2002.

Rehearing Denied Aug. 2, 2002.

John D. Vandenberg, Klarquist Spark-man, LLP, of Portland, OR, argued for plaintiff/counterclaim defendant-appellee, Microsoft Corporation. With him on the brief was Kristin L. Cleveland. Of counsel on the brief were Charles K. Verhoeven, and Jennifer K. Hartog, Quinn Emanuel Urquhart Oliver & Hedges, LLP, of San Francisco, CA, for plaintiff/counterclaim defendant-appellee, Netscape Communications Corporation, and counterclaim defendant-appellee, America Online, Inc. Of counsel was T. Andrew Culbert, Microsoft Corporation, of Redmond, Washington.

Susan Marie Spaeth, Townsend and Townsend, of Palo Alto, CA, argued for defendant/counterclaimant-appellant. On the brief were Scott R. Campbell, and Oriet Cohen Supple, Zelle, Hofmann, Vo-elbel, Mason & Gette, L.L.P., of San Francisco, CA; and William D. Cramer, Richard G. Urquhart, and Brett A. Wall-ingford, Zelle, Hofmann, Voelbel, Mason & Gette, L.L.P., of Dallas, TX.

Before MAYER, Chief Judge, NEWMAN and PROST, Circuit Judges.

MAYER, Chief Judge.

Allan M. Konrad appeals from the judgment of the United States District Court for the Northern District of California granting Netscape Communications Corp., Microsoft Corp., and America Online, Inc. ("Netscape") summary judgment that U.S. Patent Nos. 5,544,320 (the "'320 patent"), 5,696,901 (the "'901 patent"), and 5,974,444 (the "'444 patent") are invalid under the public use and on-sale bars of 35 U.S.C. § 102(b). *Netscape Communications Corp. v. Konrad*, No. C 00–20789 JW (N.D. Cal. April 2, 2001). Because we agree with the district court that Konrad has not raised a genuine issue as to any material fact pertaining to pre-critical date demonstrations, public uses by others, and his commercial offer to create the high energy physics remote database object, we affirm.[1]

## Background

Konrad is the owner of the '320, '901, and '444 patents, all directed to systems that allow a computer user to access and search a database residing on a remote computer. He began working as a staff scientist for the Lawrence Berkeley Laboratory in 1977, where he studied how an individual computer workstation user could obtain services from a remote computer. On September 26, 1990, while working with Cynthia Hertzer, a Lawrence Berkeley Laboratory staff assistant, Konrad successfully tested the remote database object system. The first prototype of this system was configured to access Lawrence Berkeley Laboratory's STAFF database from a remote workstation. The Lawrence Berkeley Laboratory STAFF database resided on an IBM mainframe computer on the Berkeley campus of the University of California. A local starter portion of the remote database object system prototype was created for installation on users' personal computers to allow the display of an icon by which the user could access the remote database. In 1991, Konrad and Hertzer adapted the Lawrence Berkeley Laboratory STAFF remote database ob-

---

1. Konrad also appeals the California district court's determination that his pre-critical date demonstrations and offer to create the remote database object were material under 37 C.F.R. § 1.56. Because the patents at issue are invalid we do not reach the issue of materiality.

ject system prototype for the high energy physics database, maintained at the Stanford Linear Accelerator Center, which is a national laboratory operated by Stanford University. The high energy physics database was a compilation of abstracts and technical papers used as a research tool for physicists worldwide.

The '320 patent, Konrad's first issued patent, is a continuation of an application filed on January 8, 1993. The '901 patent is a continuation of the '444 patent application, which is a continuation of the '320 patent application. Thus, the earliest filing date that Konrad is entitled to is January 8, 1993, making the critical date for the public use and on-sale inquiry January 8, 1992.

On February 8, 2000, Konrad filed a patent infringement suit in the District Court for the Eastern District of Texas, alleging that thirty-nine commercial entities, all customers of Netscape, had infringed the '320, '901, and '444 patents. Citing threatened customer relationships, Netscape filed a declaratory judgment action against Konrad in the District Court for the Northern District of California, seeking a judgment of invalidity, noninfringement, and unenforceability. Netscape moved for partial summary judgment that prototypes of the invention were in public use or on-sale under 35 U.S.C. § 102(b) based on Konrad's activities prior to January 8, 1992. The California district court entered partial summary judgment for Netscape concluding that: (1) Konrad's demonstration of the claimed invention to Shuli Roth and Dick Peters, University of California computing personnel, without any obligation of confidentiality was a public use; (2) his demonstration of the high energy physics remote database object to the Stanford Linear Accelerator Center in conjunction with the use of the remote database object by University Research Association Superconducting Super Collider Laboratory employees was a public use; and (3) his offer to create the high energy physics remote database object system for the University Research Association Superconducting Super Collider Laboratory in exchange for four months full-time employment or no more than $48,000, and his stipulation that the reduction to practice of the invention occurred prior to that event, satisfied the on-sale bar. Konrad stipulated that all of the claims of the patents in suit would be invalid if the court were to find that his activities qualified as prior art. In view of this stipulation, on June 18, 2001, the district court entered the parties' joint stipulation for final judgment on invalidity. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

*Discussion*

We review a district court's grant of summary judgment *de novo.* *Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1358, 61 USPQ2d 1216, 1218 (Fed.Cir.2001). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Vanmoor v. Wal Mart Stores, Inc.,* 201 F.3d 1363, 1365, 53 USPQ2d 1377, 1378 (Fed.Cir. 2000). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.* at 255, 106 S.Ct. 2505.

■ Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless ... the invention was in public use or on

sale in this country, more than one year prior to the date of the application for patent in the United States. . . ." 35 U.S.C. § 102(b) (2000). Whether a patent is invalid for a public use or sale is a question of law based on underlying facts. *Intel Corp. v. Int'l Trade Comm'n,* 946 F.2d 821, 829, 20 USPQ2d 1161, 1169 (Fed.Cir.1991). A conclusion that a section 102(b) bar invalidates a patent must be based on clear and convincing evidence. *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 549, 16 USPQ2d 1587, 1591 (Fed.Cir. 1990).

## I.

■ Public use includes "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Petrolite Corp. v. Baker Hughes Inc.,* 96 F.3d 1423, 1425, 40 USPQ2d 1201, 1203 (Fed.Cir.1996) (citing *In re Smith,* 714 F.2d 1127, 1134, 218 USPQ 976, 983 (Fed.Cir.1983)). "The public use bar serves the policies of the patent system, for it encourages prompt filing of patent applications after inventions have been completed and publicly used, and sets an outer limit to the term of exclusivity." *Allied Colloids v. Am. Cyanamid Co.,* 64 F.3d 1570, 1574, 35 USPQ2d 1840, 1842 (Fed.Cir.1995).

■ The law recognizes that an inventor may test his invention in public without incurring the public use bar. "Experimental use negates public use; when proved, it may show that particular acts, even if apparently public in a colloquial sense, do not constitute a public use within the meaning of section 102." *Baxter Int'l, Inc. v. Cobe Labs., Inc.,* 88 F.3d 1054, 1059, 39 USPQ2d 1437, 1441 (Fed.Cir.1996) (citing *TP Labs., Inc. v. Prof'l Positioners, Inc.,* 724 F.2d 965, 971, 220 USPQ 577, 582 (Fed.Cir.1984)). "The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use." *City of Elizabeth v. Am. Nicholson Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1877).

■ We look to the totality of the circumstances when evaluating whether there has been a public use within the meaning of section 102(b). *Sinskey v. Pharmacia Ophthalmics Inc.,* 982 F.2d 494, 498, 25 USPQ2d 1290, 1293 (Fed.Cir. 1992). The totality of the circumstances is considered in conjunction with the policies underlying the public use bar. *Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192, 1198, 31 USPQ2d 1321, 1324 (Fed.Cir. 1994). The circumstances may include: the nature of the activity that occurred in public; the public access to and knowledge of the public use; whether there was any confidentiality obligation imposed on persons who observed the use; whether persons other than the inventor performed the testing; the number of tests; the length of the test period in relation to tests of similar devices; and whether the inventor received payment for the testing. *See Allied Colloids,* 64 F.3d at 1574, 35 USPQ2d at 1842; *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564, 4 USPQ2d 1210, 1214 (Fed.Cir.1987); *In re Brigance,* 792 F.2d 1103, 1107–08, 229 USPQ 988, 991 (Fed.Cir.1986); *Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1535, 222 USPQ 553, 557 (Fed.Cir.1984); *TP Labs., Inc.,* 724 F.2d at 971–72, 220 USPQ at 582. There may be additional factors in a particular case relevant to the public nature of the use or any asserted experimental aspect. On summary judgment, once Netscape presented facts sufficient to establish a prima facie case of public use, it fell to Konrad to come forward with some evidence raising a genuine issue of materi-

al fact to the contrary. *Sinskey*, 982 F.2d at 498, 25 USPQ2d at 1293; *Petrolite Corp.*, 96 F.3d at 1425, 40 USPQ2d at 1203.

## A.

■ Konrad argues that the district court erred in determining that his 1991 demonstration of the Lawrence Berkeley Laboratory STAFF remote database object to University of California computing personnel was an invalidating public use. He maintains that the invention disclosure he submitted to the Lawrence Berkeley Laboratory patent department in October of 1990, established an expectation of confidentiality from Roth and Peters. Netscape responds that the district court correctly determined that Konrad failed to establish a genuine issue of material fact that the demonstrated prototype was not in public use, and was prior art for the purpose of evaluating the validity of the patents in suit.

We agree with Netscape. Konrad did not show that Roth or Peters were ever made aware of any requirement of confidentiality or even apprised of the invention disclosure forms that he submitted to the Lawrence Berkeley Laboratory patent department. He also did not make any discernable effort to inform the 1991 demonstration attendees of the requirement of confidentiality, or otherwise indicate to them that they would owe him a duty of confidentiality.

"In some circumstances, . . . it would be significant that no pledge of confidentiality was obtained from the user." *TP Labs., Inc.*, 724 F.2d at 972, 220 USPQ at 583. Lack of a confidentiality agreement is significant here because Roth and Peters were computer personnel who could easily demonstrate the invention to others.

■ Next, Konrad argues that the 1991 demonstration was not a public use because he did not disclose every limitation of his invention, particularly the starter client of the remote database object, to Roth and Peters. We are not persuaded. Section 102(b) may bar patentability by anticipation if the device used in public includes every limitation of the later claimed invention, or by obviousness if the differences between the claimed invention and the device used would have been obvious to one of ordinary skill in the art. *See Lough v. Brunswick Corp.*, 86 F.3d 1113, 1122 n. 5, 39 USPQ2d 1100, 1107 n. 5 (Fed.Cir.1996) (citing *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1071, 22 USPQ2d 1025, 1028 (Fed.Cir.1992)). Konrad testified that he demonstrated a remote object client and that the only difference between it and the remote database object was initialization by a starter client. He further testified that his use of a computer keyboard to initiate the remote database object could have been accomplished by clicking a mouse pointer on a starter client icon on a computer screen. Based on this testimony, the starter client is very similar to, if not the same as, software program icons created to quickly initiate a program. The difference between the claimed invention and the device used would have been obvious to persons of ordinary skill in the art.

■ Konrad also argues that the 1991 demonstration was an experimental use for the purpose of obtaining technical support to incorporate upgrades and make the invention run more smoothly. To establish that an otherwise public use does not run afoul of section 102(b), it must be shown that the activity was "substantially for purposes of experiment." *Baker Oil Tools, Inc.*, 828 F.2d at 1564, 4 USPQ2d at 1214. Konrad presented no objective evidence to support experimental use. Indeed, his testimony leads to the opposite conclusion. He said that the purpose of

the demonstration "was to convince the people in the Berkeley computer center VM systems group that there was a viable project." He added that he hoped showing them the remote database object would make them supportive of it. Konrad's demonstration was geared more toward making the remote database object more commercially attractive, with endorsements from outside technical people, than for experimental use purposes. The experimental use negation is unavailable to a patentee when the evidence presented does not establish that he was conducting a bona fide experiment. *TP Labs., Inc.*, 724 F.2d at 969, 220 USPQ at 580. Furthermore, Konrad presented no objective evidence that he maintained any records of testing the remote database object. This failure weighs against him. *Allied Colloids*, 64 F.3d at 1576, 35 USPQ2d at 1844; *TP Labs., Inc.*, 724 F.2d at 972–73, 220 USPQ at 583) (recognizing that whether records were kept of progress may indicate that an inventor was testing the device, not the market).

■ Konrad also argues that at all relevant times he took affirmative steps to maintain control of his invention and questions the substantiality of the evidence to the contrary. He asserts that *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 229 USPQ 805 (Fed.Cir.1986), applies here. That case said that the display of a device to friends and colleagues of the inventor was subject to an implied restriction of confidentiality, and thus did not constitute a public use. However, that inventor always retained control over the use of the device as well as over the distribution of information concerning it. *Id.* at 1266, 793 F.2d 1261, 229 USPQ at 808. Here, Konrad testified that during 1991 he did not monitor tests of the remote database object, but that he would simply turn on the system and let people try it out.

He further testified that he was aware that a workstation was made available to use the remote database object system, but was unaware of where it was located. There was no indication that he ever monitored this workstation's use or imposed a confidentiality agreement on those persons exercising the database.

### B.

■ Konrad argues that the district court erred in determining that the demonstration of the high energy physics remote database object system to Stanford Linear Accelerator Center and use by University Research Association Superconducting Super Collider Laboratory employees were invalidating public uses under section 102(b). He contends that the Department of Energy owned all of the intellectual property rights to the invention, and that all Department of Energy laboratory employees were under an obligation of confidentiality to the government during all demonstrations and testing. To support this contention, Konrad relies on the testimony of Paul Martin concerning the invention disclosure rules of Lawrence Berkeley Laboratory, and the contract between Lawrence Berkeley Laboratory and the Department of Energy. Konrad also relies on the testimony of Louise Addis, a librarian at Stanford Linear Accelerator Center, to support his position that he maintained control over his invention through the use of passwords.

Konrad tries to cloak his failure to protect the confidentiality of his invention and maintain control of others use by arguing that because the Department of Energy was providing the funding for his project, it ultimately owned the invention; therefore, anyone working on the remote database object server was subject to Department of Energy confidentiality. This argument is without merit. Konrad is the

inventor of the patents; the limitation, restriction, or obligation of secrecy of others using the invention is owed to him, not the persons or entities providing the funding. *See Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755 (1881). The onus is on him, as the inventor, to protect the confidentiality of his invention and its use by others before the critical date. The contract between Lawrence Berkeley Laboratory and the Department of Energy provides for the protection of government property, the University of California's duty to safeguard restricted data and provide written disclosures, and the government's right to duplicate and disclose the subject invention. Moreover, Konrad has not shown that this contract applied to the University Research Association Superconducting Super Collider Laboratory or Stanford Linear Accelerator Center employees.

 Konrad says that the demonstration of the high energy physics remote database object system at the Stanford Linear Accelerator Center was not enabling because there was no evidence that the source code was delivered to the Superconducting Super Collider Laboratory before the critical date. However, it is the claims that define a patented invention. *See Constant v. Advanced Micro Devices, Inc.,* 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed.Cir.1988). As we have already said, Konrad's failure to monitor the use of his remote database object system, and failure to impose confidentiality agreements on those that used it was enough to place the claimed features of the patents in the public's possession. *Lockwood v. American Airlines,* 107 F.3d 1565, 1570, 41 USPQ2d 1961, 1965 (Fed.Cir.1997) (citing *In re Epstein,* 32 F.3d 1559, 1567–68, 31 USPQ2d 1817, 1823 (Fed.Cir.1994) ("Beyond this 'in public use or on sale'

finding, there is no requirement for an enablement-type inquiry.")). Konrad cannot negate this by evidence showing that other, unclaimed aspects, such as the source code, was not publicly available.

## II.

 The on-sale bar applies when the invention is the subject of a commercial offer for sale, and is ready for patenting before the critical date. *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The ready for patenting condition "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67–68, 119 S.Ct. 304. The overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term. *STX, LLC v. Brine, Inc.,* 211 F.3d 588, 590, 54 USPQ2d 1347, 1349 (Fed.Cir.2000). When the asserted basis of invalidity is an on-sale bar, the court should determine "whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention." *Scaltech Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 1383, 51 USPQ2d 1055, 1058 (Fed.Cir.1999). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under [section] 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1048, 59 USPQ2d 1121, 1126 (Fed.Cir.2001). To determine if the offer is sufficiently definite, one must examine

the language of the proposal in accordance with the principles of general contract law. *See id.*

■ Konrad primarily argues that the court erroneously concluded that his offer to make the high energy physics remote database object for the University Research Association Superconducting Super Collider Laboratory in exchange for four months full time employment or no more than $48,000 constituted a commercial offer for sale. He contends that the memorandum purchase order memorializing the agreement is not a contract, but merely an accounting instrument used to track the transfer of research funds between two Department of Energy laboratories, and therefore did not involve the sale of a commercial embodiment of the invention.

Netscape responds that the memorandum purchase order is only one of the contemporaneous documents relied on by the district court in its analysis of whether Konrad's offer was within the purview of the on-sale bar of section 102(b). It contends that the memorandum purchase order is an offer to sell a working prototype of the remote database object to the Stanford Linear Accelerator Center and qualifies as such by listing the product to be purchased, the delivery date, and the price. The district court observed that Konrad had extended commercial offers for the sale of the remote database object prototype to the University Research Association Superconducting Super Collider Laboratory in September of 1991. The court also determined that he failed to establish a genuine issue of material fact that the commercial offer between Lawrence Berkeley Laboratory and University Research Association Superconducting Super Collider Laboratory involved two Department of Energy controlled entities.

■ The evidence on summary judgment evinces that the memorandum purchase order memorialized Konrad's proposal, which was accepted by Lawrence Berkeley Laboratory subject to revisions, to provide a working prototype of a remote database object configured to support the high energy physics database at Stanford Linear Accelerator Center for $48,000. But, we have held that a sale or offer to sell under section 102(b) must be between two separate entities. *In re Caveney,* 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir. 1985). Where, as in this case, both parties to an alleged commercial offer for sale receive research funds from the same entity, it may be more difficult to determine whether the inventor is attempting to commercialize his invention. Accordingly, in such cases whether there is a bar depends on whether the seller so controls the purchaser that the invention remains out of the public's hands. *Ferag v. Quipp, Inc.,* 45 F.3d 1562, 1567, 33 USPQ2d 1512, 1515 (Fed.Cir.1995) (citing *In re Caveney,* 761 F.2d at 676, 226 USPQ at 4). All indications are that the Department of Energy funded specific projects of Lawrence Berkeley Laboratory, the Superconducting Super Collider Laboratory, and Stanford Linear Accelerator Center, but never exercised such control over them, as to render all part of the same entity. Therefore, the first condition of the on-sale bar is satisfied because this transaction constituted an offer from the University Research Association Superconducting Super Collider Laboratory for the sale of the remote database object prototype that was accepted by Lawrence Berkeley Laboratory.

The only remaining question is whether the invention was ready for patenting at the time of the offer for sale. Konrad admitted that the reduction to practice date was on or about September 26, 1990, before the critical date, and his disclosure

of the remote database object to Roth and Peters in October of 1990 was sufficiently specific to enable them, as persons of ordinary skill in the art, to practice the invention. Therefore, all the claims of the '320, '901, and '444 patents are invalid under the on-sale bar of section 102(b).

*Conclusion*

Accordingly, the judgment of the United States District Court for the Northern District of California is affirmed.

*AFFIRMED.*